ADRIENNA WONG
(State Bar No. 282026)
   *awong@aclusocal.org*
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
225 West Hospitality Lane, Suite 211
San Bernardino, CA 92408
Telephone:  (909) 380-7510
Facsimile:   (909) 915-1194

BELINDA ESCOBOSA HELZER
(State Bar No. 214178)
   *bescobosahelzer@aclusocal.org*
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1851 East First St., Suite 450
Santa Ana, CA 92705
Telephone:  (714) 450-3962
Facsimile:   (714) 543-5240

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| VICTOR VALLEY FAMILY RESOURCE CENTER, a non-profit corporation; SHARON GREEN, individually; DANIEL AVILA, HAROLD BATTS, DAVID DEEN, CHRIS DOWDY, RENEE GULLETT, and NICHOLAS HOLT-FRANCIS individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF HESPERIA, a California general law city; JOHN McMAHON, in his official capacity; ERNESTO MONTES, in his official capacity; and DOES 1 through 25, in their official and individual capacities,<br><br>Defendants. | CASE NO.   5:16-CV-00903<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES**<br><br>First, Fourth, and Fourteenth Amendments to the United States Constitution (42 U.S.C. § 1983); article I, sections 1, 7, 13, 24 and article XI, section 7 of the California Constitution.<br><br>**DEMAND FOR JURY TRIAL** |

# INTRODUCTION

1.      Plaintiff Victor Valley Family Resource Center ("VVFRC") is a non-profit charitable organization dedicated to reducing homelessness and recidivism by providing homeless and previously incarcerated individuals with the skills, resources, and supports they need to successfully reintegrate into the community. VVFRC offers transitional housing and service interventions targeting the time-sensitive needs of people in reentry.  VVFRC's programs are based on the understanding that homelessness increases the risk of incarceration and re-incarceration, but connecting people to housing and services works to reduce recidivism.  VVFRC is also based on the principle that people who have encountered challenges in the past nevertheless deserve to have their rights respected, to be treated with dignity, and to be afforded opportunities to establish healthy and meaningful lives.

2.      Plaintiffs Daniel Avila, Harold Batts, David Deen, Chris Dowdy, Renee Gullet, Nicholas Holt-Francis, and those similarly situated are individuals who are on probation who have faced homelessness, and who are current beneficiaries of VVFRC's efforts.

3.      The types of services provided by VVFRC are a crucial component of the state of California's recent and ongoing overhaul of its criminal justice system, which aims to reduce the state's inmate population and better promote public safety by focusing on rehabilitation and prevention measures.

4.      Defendants are city of Hesperia officials, and those working on its behalf, who are intent on obstructing what California lawmakers, voters, and the United States Supreme Court believe to be a necessary reorientation of California's criminal justice system.  Defendants fear that state criminal justice reforms, such as California's Public Safety Realignment Act (AB109) and the Safe Neighborhoods and Schools Act (Proposition 47), will cause an influx of people with criminal records to move into Hesperia, threatening their preferred "demographic" for the

city.  Rather than participate in statewide efforts to safely reintegrate individuals with criminal records into the community, Defendants have enacted and enforced municipal ordinances designed to exclude such individuals from housing in the city.

5.    Defendants continue to engage in policies and practices that limit the housing options for persons on probation, prohibit transitional supportive housing, and incite landlords to evict tenants like Plaintiff VVFRC and its clients.  By doing so, Defendants not only violate Plaintiffs' constitutional and statutory rights, but also compromise public safety, increase homelessness, and deprive the region of successful integrative and supportive services that make all Hesperia residents safer.

6.    Accordingly, Plaintiffs bring this litigation against Defendants for violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution (42 U.S.C. § 1983), as well as article I, sections 1, 7, 13, 24 and article XI, section 7 of the California Constitution.

## JURISDICTION AND VENUE

7.    The Court has jurisdiction over the federal civil rights claims under 28 U.S.C. §§ 1331 and 1343.  The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

8.    Venue is proper in the Central District of California under 28 U.S.C. § 1391(b).  Defendants are located in the Central District and all of the acts and/or omissions complained of herein have occurred or will occur in this District.

## PARTIES

### Plaintiffs

9.    Plaintiff VICTOR VALLEY FAMILY RESOURCE CENTER ("VVFRC") is a non-profit 501(c)(3) tax-exempt charitable organization whose mission is to provide mental, economic, and educational services to at-risk and underserved residents of San Bernardino communities.  VVFRC's office is located in the city of Hesperia ("City").  VVRFC has been doing business in the City since 2009 and has a valid business license to do so.

10.    Plaintiff VVFRC provides transitional housing and services to individuals who are homeless or at risk of becoming homeless.  It rents and manages residential homes in Hesperia, which provide transitional supportive housing to persons on probation who would otherwise be homeless.  The municipal code provisions and Defendants' actions challenged in this case directly harm VVFRC, as well as frustrate VVFRC's mission and prompt the diversion of its limited resources.

11.    Plaintiff SHARON GREEN is the founding Director and Chief Executive Officer of VVFRC.  She is the lessee of some of the homes the organization manages in Hesperia to provide transitional supportive housing to its clients.

12.    Plaintiff DANIEL AVILA is a resident of the city of Hesperia and a client of VVFRC's transitional supportive housing program.  He resides in one of the houses that VVFRC rents and manages in Hesperia.  Avila is on probation and lives with other VVFRC clients who are also on probation.

13.    Avila was referred to VVFRC by the San Bernardino County Probation Department.  Before the Probation Department connected him to VVFRC, Avila had been periodically homeless and cycling in and out of jail for eight years.  In the past, when Avila was released from jail, he would have nowhere to go, and nothing to eat. He would end up in unstable environments that exacerbated his drug addiction.

14.    Currently, however, Avila has stable housing in a home he shares with people who support and inspire him.  Avila is now sober and participating in a program that will help him maintain that sobriety.  With VVFRC's help, Avila enrolled in Medi-Cal and, for the first time in eight years, obtained his birth certificate and social security card – vital documents that prepare him to secure employment.  With VVFRC's assistance, Avila is in the process of looking for a job and getting his driver's license.

15.     Plaintiff HAROLD BATTS is a resident of the city of Hesperia and a client of VVFRC's transitional supportive housing program.  He resides in one of the houses that VVFRC rents and manages in Hesperia.  Batts has been a resident of Hesperia since 1975.  Currently, Batts is on probation and lives with other VVFRC clients who are also on probation.

16.     When Batts was released from custody, he initially went to live with his daughter, but was unable to stay because her landlord would not permit another resident in the unit.  As a result, Batts became homeless.  Batts' probation officer then referred him to VVFRC.

17.     Batts now has reliable housing that helps him comply with the terms of his probation and stay in touch with his probation officer.  Batts has benefitted from the support of other residents of the home and VVFRC staff, who have connected him with employment opportunities.  He received funding for training to become a truck driver and is hopeful that he will have permanent employment soon.  For the time being, however, Batts would have nothing to fall back on if he were denied access to VVFRC's transitional housing program; if forced to leave his current residence, he would likely become homeless again.

18.     Plaintiff DAVID DEEN is a resident of the city of Hesperia and a client of VVFRC's transitional supportive housing program.  He resides in one of the houses that VVFRC rents and manages in Hesperia.  Deen is on probation and lives with other VVFRC clients who are also on probation.

19.     When Deen was first released from custody, he stayed in motel rooms that he paid for with money he earned by serving as a firefighter with the state's inmate fire camp program.  After a few days, however, that money ran out, and he had nowhere else to live.  At that point, the Probation Department referred him to VVFRC.

20.     Deen now has a home where he can sleep safely at night.  That home serves as a base of operations from which Deen can apply for jobs and educational

opportunities.    VVFRC staff have helped Deen with referrals to counseling, connections to job centers, and other aspects of reentry.  Deen believes he can make a new start from this home.  If he was forced to leave the house where he currently lives, however, he would be back on the street.

21.    Plaintiff CHRIS DOWDY is a resident of the city of Hesperia and a client of VVFRC's transitional supportive housing program.  He resides in one of the houses that VVFRC rents and manages in Hesperia.  Dowdy is on probation and lives with other VVFRC clients who are also on probation.

22.    Dowdy was referred to VVFRC by the San Bernardino County Probation Department upon his release from custody.  Previously, Dowdy lived with his sister.  While Dowdy was in jail, however, his sister lost her house and was forced to move out of state.  As a result, Dowdy faced homelessness upon his release.

23.    VVFRC helped Dowdy avoid homelessness.  In the home where he now lives, Dowdy participates in what he describes as an "environment of mutual accountability"; he and fellow residents hold each other accountable for their behavior and remind each other to take caution when they are at risk of violating the terms of their probation.  Dowdy has benefitted from the guidance of his VVFRC case manager, who helps him set and meet goals.  The two men attend church together weekly.  With VVFRC's assistance, Dowdy has obtained a driver's license, enrolled in a workforce training class, secured and maintained a full time job, and is in the process of receiving his GED.  Dowdy credits VVFRC with putting him on the path to becoming a productive member of society.

24.    Plaintiff RENEE GULLET is a resident of the city of Hesperia and a client of VVFRC's transitional supportive housing program.  She resides in one of the houses that VVFRC rents and manages in Hesperia.  Gullet is on probation and lives with other VVFRC clients who are also on probation.

25.    Gullet was referred to VVFRC by San Bernardino County Probation Department in January 2016.  Prior to that, she was living in a homeless shelter.

26.     Gullett has a criminal record related to her past drug addiction, but she is sober now.  The women she currently lives with have been supportive of her recovery and reentry.  She considers the women in the home to be their "own little family."  They work together to do chores and keep the house clean.  VVFRC staff have also provided Gullett with substantial support.  She is making progress towards a sustainable, stable life because of the resources that VVFRC offers her.  She sometimes has temporary work and is seeking permanent employment.  She is interested in the possibility of renting her own apartment in Hesperia.

27.     Plaintiff NICHOLAS HOLT-FRANCIS is a resident of the city of Hesperia and a client of VVFRC's transitional supportive housing program.  He resides in one of the houses that VVFRC rents and manages in Hesperia.  Holt-Francis is on probation and lives with other VVFRC clients who are also on probation.

28.     At the age of 19, Holt-Francis became homeless for roughly a year before he was incarcerated.  When Holt-Francis was released from custody, he was homeless again, so the San Bernardino County Probation Department referred him to VVFRC.

29.      Holt-Francis now has stable housing that allows him to more easily comply with the terms of his probation so he can avoid re-incarceration and focus his energies on building a sustainable life for himself.  If he were still homeless, he would have to travel to the Probation Department office in Victorville to check in on a daily basis; if he simply missed an appointment to do so, the Probation Department could issue a warrant for him or send him to prison.  Now, the Probation Department knows where Holt-Francis is every day, can more easily check in on him, and does not require him to travel to Victorville every morning.

30.     Holt-Francis likes the house where he lives, and the people with whom he shares his home.  He enjoys the sober living environment, which allows him to focus on looking for work.  It helps him to be around other people who have a

positive outlook and are seeking employment like him.  If he was forced to leave the house where he lives now, he would be homeless again.

### Defendants

31.    Defendant CITY OF HESPERIA ("City") is an incorporated municipality located in San Bernardino County.  It is a general law city and adopts municipal ordinances through a five-member city council.  These ordinances are enforced by the Hesperia Police Department, which is staffed by employees of the San Bernardino County Sheriff's Department; the City contracts with the San Bernardino County Sheriff's Department for police services.   The City Code Enforcement Division also enforces Hesperia's municipal ordinances.

32.    Defendant JOHN McMAHON is the Sheriff of San Bernardino County.  The San Bernardino County Sheriff's Department, which includes the Hesperia Police Station, is under his command.   The San Bernardino County Sheriff's Department provides police services to the City of Hesperia by contract.   In providing police services to the City,  San Bernardino County Sheriff's officers manage general law enforcement within the City, including patrol services, traffic enforcement, and criminal investigations.  They also network with a variety of law enforcement partners such as City Code Enforcement, Parole, and Probation.  Defendant McMahon is sued in his official capacity.

33.    Defendant ERNESTO MONTES is a Code Enforcement officer for the City.  Plaintiffs are informed and therefore believe that Montes is an employee of the City.  Defendant Montes is sued in his official capacity.

34.    Each of the complained violations of law were committed by Defendants, their officials, agents, and employees, acting under color of law.

35.    The true names and capacities, whether individual, corporate, associate, representative or otherwise, of the defendants identified as Does 1 through 25, inclusive, are unknown to Plaintiffs, who therefore sue these defendants by such fictitious names.  Plaintiffs will amend this complaint to allege the true names and

1  capacities of Does 1 through 25 when they have been ascertained.  Does 1 through
2  25 are in some manner legally responsible for the wrongs and injuries alleged herein.

3  ## STATEMENT OF FACTS

4  ### *Victor Valley Family Resource Center*

5      36.    Plaintiff Green is the founding Director and Chief Executive Officer of
6  Victor Valley Family Resource Center.  She is currently the Chair of San Bernardino
7  County's Homeless Provider/Partnership Network, is on the San Bernardino
8  Interagency Council on Homelessness, and is on the San Bernardino Reentry
9  Collaborative Board.

10     37.    In years past, Green, who is presently a pastor at a local church in
11  Hesperia, went through a difficult divorce, which left her homeless.  When she got
12  back on her feet she did not want anyone to have to experience homelessness as she
13  had.  As a result of her experience, Green founded VVFRC in 2009 to provide
14  housing and supportive services for individuals experiencing homelessness or at risk
15  of becoming homeless.

16     38.    VVFRC's transitional housing program provides housing and
17  supportive services to individual clients for up to one year.  The program is based,
18  in part, on a Housing First model.  The Housing First model is a proven method of
19  addressing homelessness, and is considered the most effective approach to ending
20  chronic homelessness.  Programs based on the Housing First model offer individuals
21  and families experiencing homelessness immediate access to housing.  Like other
22  programs utilizing the Housing First approach, VVFRC's transitional housing
23  program addresses housing as the priority need of the individual, then leverages the
24  resulting relationship it has with its clients to address underlying individual needs.

25     39.    In addition to providing their clients with a place to live, VVFRC
26  provides wraparound support services to its clients, including, but not limited to,
27  case management, counseling, and anger management training.  The organization
28  connects its clients to alcohol and substance abuse programs, job centers, and

1 educational programs.  Additionally, VVFRC partners with Wells Fargo to provide
2 financial literacy training to its clients so that they can sustain and manage their own
3 finances after they leave the VVFRC program.   VVFRC works with other
4 organizations to identify permanent housing options for its clients.   The
5 organization's ultimate goal is to help clients navigate the transition from the
6 transitional housing program to permanent housing and/or family reunification.

7     40.   VVFRC's transitional housing program provides "critical time
8 interventions."  Researchers have conceptualized reentry as a pivotal time period in
9 the lives of formerly institutionalized people, requiring interventions that target the
10 time-sensitive needs people experience as they transition back to the community.
11 Research shows that "critical time interventions" improve outcomes of people
12 reentering the community.

13     41.   VVFRC has approximately twenty-six employees, a majority of whom
14 have experienced homelessness and/or have been at risk of being homeless.  VVFRC
15 believes that it is a critical part of rehabilitation and reintegration into the community
16 for its staff to relate to and share experiences with its clients.  That VVFRC's staff
17 can identify with the experiences of its clients builds trust and mutual respect, which
18 is at the core of the organization's success.

19 ***Victor Valley Family Resource Center's Clients***

20     42.   VVFRC's clients are usually referred to the organization's transitional
21 supportive housing program by the courts, the San Bernardino County Probation
22 Department, or the San Bernardino County Department of Behavioral Health.
23 VVFRC also works in collaboration with the San Bernardino County Sheriff's
24 Department's Homeless Outreach and Protective Enforcement ("HOPE") Team,
25 which links homeless individuals with resources and service providers throughout
26 San Bernardino County.  The HOPE Team's stated objective is to "stop the revolving
27 door of arrest, incarceration, and then release regarding homeless related crimes."
28

43.     Approximately ninety percent of VVFRC's clients have experienced alcoholism or drug addiction.  About seventy percent of its clients have a disability in addition to or separate from alcoholism or addiction, such as depression, Post-Traumatic Stress Disorder, diabetes, and/or degenerative disc disease, to name a few. If a prospective client's mental health is not manageable through medication, or if the individual is a sex offender, the individual will not be placed in the VVFRC program, but will instead be placed in a specific home through the San Bernardino County Department of Behavioral Health or other entity.

44.     When clients enter VVFRC's program, they are required to sign a program contract agreeing to adhere to VVFRC's policies.  For example, VVFRC's clients must be sober, search for work, be willing to do chores around the house, and keep their bedrooms clean.

45.     VVFRC has an eighty to eighty-five percent success rate, meaning that after its clients graduate from the transitional supportive housing program, they remain employed and/or enrolled in school and have permanent housing.  According to VVFRC's records, ninety-four percent of its clients in reentry do not recidivate.

*VVFRC's Transitional Supportive Housing Program in Hesperia*

46.     VVFRC currently rents and maintains three homes as part of its transitional supportive housing program, all of which are located in Hesperia.  The three houses are owned by three separate owners and are located on La Crescenta Street ("La Crescenta House"), Hollister Street ("Hollister House"), and Azalea Springs Avenue ("Azalea House").  The homeowners are all aware of and support VVFRC's transitional supportive housing program.

47.     In many respects, each transitional home is like any typical residential home.  There is a great room with sofas where residents watch television together. There is a kitchen and dining area where residents cook and eat with each other and VVFRC's on-site staff.  Residents sleep and keep their personal belongings in their bedrooms.  They play basketball together and garden in the backyard.  They leave

1    to go to work and return home at the end of the work day.

2        48.    In other words, the transitional homes are residential uses.  There are

3    no activities taking place at the homes that might cause any unusual increase in

4    traffic or noise.  Indeed, it is the job of the on-site VVFRC staff to ensure that the

5    environment of each home is suitably residential.

6        49.    VVFRC opened the La Crescenta House in 2011 and the Hollister and

7    Azalea Houses in 2015.  Plaintiffs are informed and believe that there have been no

8    substantive complaints from neighbors regarding those homes or its residents.  The

9    homes look no different than any other home in the neighborhood.

10       50.    Although VVFRC offers housing and supportive services for up to one

11   year, its clients generally transition to permanent housing within six to nine months.

12   VVFRC can serve up to 80 individuals a year.

13       51.    From July 2012 to June 2015, VVFRC received Community

14   Development Block Grants from the city of Hesperia to provide homeless and

15   transitional housing services.  VVFRC received its first one-year grant in July 2012,

16   which was renewed in 2013 and 2014.  Hesperia included VVFRC in the City's

17   General Plan and listed the organization as a resource for special needs groups –

18   "Homelessness and Persons in Poverty" – in its 2013 to 2021 Housing Element.

19       52.    In 2013, VVFRC competed with four other vendors and successfully

20   obtained a contract with the County of San Bernardino Probation Department to

21   provide housing services for "AB 109/Adult Probationers" who are considered

22   homeless and under the supervision of the Probation Department.  The term of the

23   contract is three years with the option to extend two additional one-year terms.  The

24   County's Board of Supervisors approved the agreement on October 22, 2013.  It

25   became effective November 1, 2013.

26       53.    The contract mandates that VVFRC maintain confidentiality in the

27   delivery of its housing services.  Accordingly, VVFRC stores all information

28   regarding its clients in a locked filing cabinet behind two locked doors.  The

organization's internal practice is to identify clients by their first initial and last name only.

54.     Currently, all of VVFRC's clients are on probation.  Probation officers come to the VVFRC houses about three times a week to conduct probation checks. Having VVFRC clients living together in VVFRC houses makes the Probation Department's job easier and increases the chances that VVFRC's clients will succeed and meet the conditions of their probation.  Probation officers know where the individuals they supervise are, that they have a curfew, and that they are employed or actively looking for work or going to school.

55.     The San Bernardino County Probation Department is impressed and pleased with VVFRC's program.  It refers to the program as a model for transitional supportive housing service programs.   In fact, the Probation Department has suggested that the County not exercise its option to renew the current contract, but instead have VVFRC reapply through a new Request for Proposal to expand its transitional supportive housing program to the cities of San Bernardino, Rancho Cucamonga, and Yucca Valley.

***California's Public Safety Reforms (AB 109 and Proposition 47)***

56.     On May 23, 2011, in *Brown v. Plata*, 563 U.S. 493 (2011), the United States Supreme Court ordered that California significantly reduce its prison population.  At the time, California prisons held nearly twice as many people as they were designed to house, despite a significant increase in prison construction.  The Court held that this overcrowding subjects inmates to horrific conditions sufficient to constitute cruel and unusual punishment prohibited by the Eighth Amendment to the United States Constitution.

57.     In response, the state of California enacted state-wide criminal justice reforms through "California's Public Safety Realignment Act" or "AB 109".  In enacting such reforms, the Legislature recognized that "[c]riminal justice policies that rely on building and operating more prisons to address community safety

1    concerns are not sustainable, and will not result in improved public safety." Cal.

2    Penal Code § 17.5(3) (West 2016).   The Legislature also recognized that

3    California's recidivism rate for individuals who have served time in prison – 57.8%

4    – far outpaced the national average. *See id.* § 17.5(2).

5         58.   Affirming the state's "commitment to reducing recidivism among

6    criminal offenders," AB 109 redirected resources from building more prisons to

7    investing in "more cost-effective, evidence-based strategies that increase public

8    safety," such as community-based residential programs, like Plaintiff VVFRC's

9    program, which offer "structure, supervision, drug treatment, alcohol treatment,

10   literacy programing, employment counseling, psychological counseling, mental

11   health treatment or any combination of these and other interventions." Cal. Penal

12   Code § 17.5.

13        59.   Research on how local governments approached AB 109 realignment

14   indicates that formerly incarcerated people do better in counties that emphasize and

15   invest in reentry services; in contrast, recidivism has increased in counties that

16   responded to realignment by prioritizing enforcement.[1]

17        60.   In 2014, California voters passed Proposition 47, the Safe

18   Neighborhoods & Schools Act.   Proposition 47 reclassified six low-level drug and

19   property felonies to misdemeanors in order to reduce spending on incarceration.   It

20   mandated that the savings from reduced incarceration be reallocated towards local

21   prevention, treatment, and rehabilitation programs.

22   ***Hesperia's Group Home Ordinance***

23        61.   In 2007, Defendant City adopted Ordinance No. 2007-07, which

24   enacted Hesperia Municipal Code section 16.16.072, regulating "residential care

25   facilities, group homes, and sex offender residency."

26   _____

27   [1] Public Policy Institute of California, *Do Local Realignment Policies Affect
     Recidivism in California* (August 2014), *available at*

28   http://www.ppic.org/main/publication.asp?i=1111.

62.   The ordinance broadly defines "group homes" as "any residential structure or unit, whether operated by an individual for profit or nonprofit entity, which is not licensed by the state of California, and which houses individuals not related by blood or marriage" (hereinafter, the "Group Home Ordinance"). HESPERIA, CAL., CODE § 16.16.072(B) (2007).

63.   The ordinance requires a conditional use permit for certain types of permissible "group homes." *Id.* § 16.16.072(D).  The ordinance outright prohibits "group homes" that house two or more individuals on probation.  *Id.* § 16.16.072(C)(2).

64.   Defendant City's enactment of the Group Home Ordinance was based on the discriminatory assumption that homes and services for probationers are inherently illegitimate.  The City's staff report on the ordinance explicitly distinguished group homes providing services to probationers from group homes that provide "legitimate services."  The staff report did not contain or reference any evidence supporting the determination that services for probationers are not "legitimate services."

65.   The legislative record for the Group Home Ordinance does not contain evidence of actual problems arising from the co-habitation of people on probation in Hesperia.  Instead, the staff report, recorded minutes of the Planning Commission, and City Council minutes make clear that the ordinance was motivated by anxiety relating to the mere presence and proximity of parolees and sex offenders in the community.  The legislative record reflects that people on probation were simply swept up in that amorphous anxiety.

66.   The Group Home Ordinance rests on unsubstantiated fears and irrational prejudice.  The legislative record and the text of the Group Home Ordinance itself demonstrate that the City was not responding to adverse impacts actually or imminently caused by residents of "group homes," residents of "parolee homes," or sex offenders, much less persons on probation – only the speculative

"possibility" that their presence alone might "change the character of residential neighborhoods" and "create concerns for the safety and welfare of [other] residents."

67.     The enactment and enforcement of the Group Home Ordinance has been consistently motivated by the negative attitudes of City officials and some Hesperia residents regarding individuals in reentry and the presumed residents of "group homes."  Defendants have targeted VVFRC for selective, aggressive, and *ultra vires* enforcement of the Group Home Ordinance in response to negative attitudes about the organization's clients expressed by neighbors of the Chase House (one of VVFRC's transitional housing homes in Hesperia, which VVFRC closed soon after it opened) and by current City Council members.

***Hesperia's Rental Housing Ordinance***

68.     In November 2015, the City adopted Ordinance No. 2015-12, requiring "the registration and regulation of housing rental businesses for crime free rental housing" (hereinafter, the "Rental Housing Ordinance").

69.     The Rental Housing Ordinance, now codified in Hesperia Municipal Code, Chapter 8.2, requires landlords to provide their tenants' personal information to the Hesperia Police Department for purposes of a background check and registration of tenants in a City database administered by the police.  The ordinance requires landlords to independently conduct an additional criminal background check on the tenant, and to keep the results of that check on file at all times.

70.     The Rental Housing Ordinance also requires landlords to initiate eviction proceedings within ten days if the chief of police provides notice that a tenant has engaged in "criminal activity."  *Id.* § 8.20.050(C)(1).  "Criminal activity" may be based on any alleged violation of federal, state, or local law or a record of a call for service; no conviction or even arrest is required before the police issue a notice.  A landlord is subject to fines and administrative citation if he or she does not comply with the ordinance's requirements.

71.     The Rental Housing Ordinance went into effect on January 1, 2016. The Hesperia Police Department announced that property managers, owners, and landlords would have until March 31, 2016 to achieve compliance with the ordinance.

72.     Defendant City enacted the Rental Housing Ordinance in reaction to a perceived demographic shift within the City.  City Council members passed the ordinance to stem and reverse the perceived influx of residents of lesser economic means, who City officials believe are more prone to engage in criminal activity and more likely to have criminal records.

73.     The City's intent in passing the Rental Housing Ordinance was to uproot and exclude groups the City Council deems undesirable, in order to restore and preserve the demographic profile preferred by City officials.  In discussing the proposed Rental Housing Ordinance at a City Council meeting, Council Member Russ Blewett stated that he supported passing the ordinance "to correct a demographical problem" in Hesperia.  He stated:  "We better improve our demographic."

74.     City officials adopted the ordinance for the purpose of driving out a perceived excess of renters who live in low-income or affordable housing.  In a meeting discussing the proposed ordinance, City Council member Mike Leonard stated:  "Our rental housing, and our section 8 housing . . . is just crazy high.  And you know we've had a lot of people move in from over the hill who are not very friendly people.  We need to work on getting them out of here. . . . [T]hese people who are sucking up section 8 housing, we need to get 'em out."  In the same meeting, another council member stated:  "The people who aggravate us . . . come here for affordable housing because the state forces us to give them affordable housing.  They come here for a lot of reasons.  But we all know there's a significant number of them that come from somewhere else with their tainted history."

75.     Defendant City also passed the Rental Housing Ordinance in reaction to prejudices and unsubstantiated fears relating to the AB 109 population and individuals benefitting from sentence reductions under Proposition 47.  The City's intent in passing the ordinance was to exclude these groups specifically, and people with criminal records in general, from housing in the City.  At a City Council meeting discussing the Rental Housing Ordinance, a council member stated, in support of the measure:  "With Prop 47 . . . the problem is going to get a lot worse.  We have no way to stop the state from passing laws from putting criminals in our cities.  If we don't get ahead of it now and get a handle on it, we're going to get a lot more criminals in our cities.  With what the state has done to us, if we don't get a handle on things, our crime rate will skyrocket.  And that is unfair to the people who own homes."

76.     At a public presentation in March 2016, the Hesperia Police explained that the Rental Housing Ordinance was intended to achieve through civil law what criminal law could not, due to state reforms like AB 109 and Proposition 47.  One officer stated, inaccurately, that Proposition 47 made all felonies misdemeanors, and AB 109 releases high risk criminals to the public, "so they're out here running around with us."

77.     The City's intent in passing and enforcing the Rental Housing Ordinance is to prevent people in reentry from living in the City.  During a presentation to the public, the Hesperia Police explained that the ordinance's purpose is to keep individuals with criminal records "out of rental properties," in order to "cut crime city-wide."  Hesperia Police officials stated that the ordinance is intended to "predict criminals through extensive background checks" so "bad guys never move in" and "their bad friends don't visit."  In a City Council meeting discussing the proposed ordinance, Council Member Blewett stated, about people with criminal records:  "I want them the hell out of my town, and I don't care where they go.

1   Because those kinds of people, I don't care what fair housing says about them, but
2   those people are of no addition and no value to the community."

3        78.   The Rental Housing Ordinance uses the language of municipal law to
4   stigmatize residential renters.   The ordinance is accompanied by a declaration of
5   purpose that identifies occupants of residential rental properties as the cause of
6   illegal activity, public nuisances, decline in property values, and "a disproportionate
7   share of code enforcement and law enforcement calls for service."

8        79.   However, the evidence received by the City Council during
9   consideration of the Rental Housing Ordinance does not support the ordinance's
10  declaration of purpose.   The Captain of the Hesperia Police reported that City crime
11  had decreased in recent years, even though, according to City Council members,
12  more low-income renters had been moving into the City during the same time period.
13  The staff report and the oral report of the Captain of the Hesperia Police indicated
14  that roughly one third of law enforcement calls for service came from rental
15  properties.   According to the 2014 Census, roughly one third of Hesperia residents
16  live in rental properties; the City Council was made aware of this fact during a public
17  meeting discussing the Ordinance.

18  ***Enforcement of the Group Home and Rental Ordinances***

19       80.   Defendants never enforced the Group Home Ordinance against
20  VVFRC until 2015, even though they knew that VVFRC had been offering
21  transitional supportive housing in Hesperia since 2011.

22       81.   In January 2015, VVFRC began offering transitional supportive
23  housing at a new location, in a leased house on Chase Avenue in Hesperia
24  (hereinafter, the "Chase House").   Neighbors of the house immediately began
25  complaining to city officials that they felt threatened by the presence of the home
26  and its residents.

27       82.   Plaintiffs are not aware of any specific complaint of crimes allegedly
28  committed or an increase in criminal activity in the neighborhood connected to the

Chase House – only that neighbors complained that they did not feel that the residents of the house should be living in the neighborhood.

83.    In response to the negative attitudes expressed by the neighbors of the Chase House, Defendants issued notices of violation to the homeowner and to Plaintiff Green under Hesperia Municipal Code sections 16.16.072(C)(1) and (C)(2), demanding that they "[c]ease operation of a group home consisting of two or more unrelated parolees, sex offenders and/or two or more individuals on probation." The notices also indicated that if they failed to comply, further action would be taken and could include criminal prosecution and/or recordation of property with abatement fees.

84.    In February 2015, VVFRC stopped providing housing at the Chase House in response to the City's actions and harassment of its clients by neighbors. VVFRC was concerned for the safety of their clients, so it provided them with alternative housing, to the extent possible, in other homes.

85.    At a March 3, 2015 City Council meeting, Hesperia's Director of Development, Scott Priester, stated:  "I'm up here to give an update on some concerns expressed on a group home that was established on Chase Avenue. Staff was made aware of this late January, early February and we began code enforcement activities."

86.    Hesperia's mayor and City Council members applauded neighbors and City staff for causing VVFRC to stop offering transitional supportive housing at the Chase House.  Council member Paul Russ stated:  "I just appreciate what everybody has done.  The staff jumped on this because there was concern in the neighborhood and you can do a lot of things if everybody works together."  Mayor Pro Tem Bill Holland stated:  "[G]reat job citizens, this one is for you."  Council member Russell Blewett stated:  "I want to compliment the staff for jumping on this . . . including the police department and code enforcement, but it was really neighborhood driven and you guys can give yourselves a big pat on the back[.]"  Blewett also opined that the

neighborhood where the Chase House was located was a "totally inappropriate place" for VVFRC clients to live.

87.     Defendants' enforcement actions were not limited to the Chase House. In or around May 2015, City Code Enforcement began issuing citations for violation of the Group Home Ordinance to the landlords of other houses where VVFRC's clients live, including the La Crescenta House.  Code Enforcement again demanded that they cease operation of group homes "consisting of two or more unrelated individuals on probation."  VVFRC paid the fines that Code Enforcement imposed on the La Crescenta House under duress.

88.     After receiving numerous citations from Defendants, as well as a letter stating that the City was placing a Notice of Pendency on the La Crescenta property, the owner of the La Crescenta House initiated eviction proceedings against VVFRC in August 2015.  After some negotiations with VVFRC, the City agreed not to prosecute the prior citations or issue new citations against VVFRC for violation of section 16.16.072 while it "reviewed its enforcement policies as they relate[d] to transitional housing."  The City cautioned, however, that its "forbearance [was] temporary."   Thereafter, the La Crescenta landlord dismissed the eviction proceedings.

89.     Defendants' forbearance was indeed temporary.  In February 2016, Defendants once again began enforcing the Group Home Ordinance against VVFRC.

90.     Defendants have issued notices of violation, notices of public nuisance, and citations to each of the three homes where VVFRC offers transitional housing, asserting violations of the Group Home Ordinance.  Defendants now assert that VVFRC is in violation of the Group Home Ordinance's conditional use permit requirement, and claim that VVFRC is operating a business in the City without a business license.  As Defendants know, VVFRC already has a business license to operate in the City, and VVFRC and its landlords are precluded from obtaining a

conditional use permit to continue offering the transitional housing currently available in the three houses, because the Group Home Ordinance specifically prohibits residences housing more than one person on probation. Defendants have disregarded VVFRC's repeated attempts to clarify the basis of its enforcement actions.

91.    Defendants have continued to escalate their enforcement of the Group Home Ordinance against VVFRC. Since March 2016, Defendants have issued near-daily fines for asserted violations of the Group Home Ordinance at VVFRC's transitional homes. Defendant Ernesto Montes, a code enforcement officer, stated that he will continue to issue fines in the amount of $1,000 per day for each house until the homes are in compliance with the Group Home Ordinance.

92.    To date, Defendants have issued citations demanding payment of fines totaling approximately $15,000 on each of VVFRC's three houses.

93.    On April 6, 2016, Plaintiff Green, by and through her legal representative, sent Defendants a Notice of Violation of Constitutional Rights pursuant to Section 5 of the Group Home Ordinance (Ordinance No. 2007-07). Section 5 states that any person can give "notice to the City Manager that the provisions of this Ordinance, on its face or as applied to that person, violates his or her Constitutional rights." Section 5 provides that upon such notice any enforcement action must be stayed until an administrative hearing is completed. To date, Defendants have not responded to Plaintiff Green's notice, scheduled an administrative hearing, or ceased enforcement actions under the Group Home Ordinance. Defendants continue to issue citations and fines under the Group Home Ordinance to VVFRC houses.

94.    Plaintiffs Green and VVFRC have provided copies of the Notice of Violation of Constitutional Rights to Defendant Montes. Nevertheless, Defendant Montes continues to issue citations and fines under the Group Home Ordinance to VVFRC houses on a near-daily basis.

95.     In addition to enforcing the Group Home Ordinance, Defendants are now also enforcing, or threatening to enforce, the Rental Housing Ordinance against VVFRC, its landlords, and its clients.

96.     Starting in early 2016, Defendants began sending letters and placing phone calls to the landlords of the houses where VVFRC provides transitional housing, making vague allegations of "criminal activity" taking place at those residences in violation of the Rental Housing Ordinance. *See* HESPERIA, CAL., CODE § 8.20.050(C)(1).  By notifying the landlords of unspecified and unsubstantiated "criminal activity," and by specifically invoking the Rental Housing Ordinance, Defendants' intent is to incite VVFRC's landlords to evict VVFRC and its clients under the ordinance.

97.     Indeed, the landlord of the La Crescenta House, by and through his legal representative, recently served VVFRC with a notice to quit.  The notice to quit asserted that VVFRC was in breach of a term of its lease that required it to comply with the law; the notice attached a copy of a letter that Deputy Necochea of the "Hesperia Sheriff's Station" sent to the homeowner, which asserted that there was "ongoing criminal activity" at the house.  The letter provided no further detail about any alleged crime, but stated that the Rental Housing Ordinance prohibited such activity.

98.     Defendants are also demanding that VVFRC turn over its client roster and its clients' personal identifying information to comply with the Rental Housing Ordinance's tenant registration requirements.

99.     Defendants have also directed VVFRC's landlords to provide the Hesperia Police Department with "tenant screening information" to comply with the Rental Housing Ordinance.

100.    Plaintiffs desire and intend to continue renting and residing in Hesperia.

101.    As the date for implementation of the Rental Housing Ordinance has passed, the threat that Defendants will take further action to enforce that ordinance

1    against Plaintiffs is presently very real.

2    ***Harm to Plaintiffs***

3        102.   The owners of the three houses that VVFRC rents and manages in

4    Hesperia to provide transitional supportive housing are increasingly anxious about

5    Defendants' enforcement actions.  Although they do not want to evict VVFRC and

6    its clients from the houses that they own, they state that they will be forced to do so

7    if Defendants do not discontinue their enforcement actions.  In fact, the owner of the

8    La Crescenta House has already served Plaintiffs VVFRC and Green with a three-

9    day notice to quit and has indicated that eviction proceedings are imminent.

10       103.   Therefore, VVFRC is in danger of losing the sites in Hesperia where it

11   provides its most crucial social services to its clients.

12       104.   VVFRC's clients are individuals who would be homeless if not for the

13   housing provided by the organization.  Accordingly, the Defendants' enforcement

14   actions place the organization's clients, including Plaintiffs Avila, Batts, Deen,

15   Dowdy, Gullett, Holt-Francis, and those similarly situated, at risk of homelessness,

16   as well as interruption of services and the accompanying loss of employment,

17   rehabilitative, and educational opportunities.  These Plaintiffs also risk losing

18   opportunities to associate with one another in the close, mutually supportive reentry

19   environment of their current homes.

20                          **CLASS ALLEGATIONS**

21       105.   Plaintiffs seek to have a class certified under Rule 23 of the Federal

22   Rules of Civil Procedure.

23       106.   The class represented by the individual plaintiffs is defined as the class

24   of all persons who rent, reside, or would reside in VVFRC transitional supportive

25   housing homes in the city of Hesperia.  A subclass represented by a subclass of

26   individual plaintiffs is defined as the class of all present and future VVFRC clients

27   who are on probation and live or seek to live in VVFRC's transitional supportive

28   housing homes in the City of Hesperia.

107.   The class is so numerous that joinder of all members is impractical. Plaintiffs believe that currently there are about 40 individuals who are subject to Defendants' unlawful policies, practices and customs and about 80 individuals each year hereafter who would be similarly harmed.  There are questions of law and fact in common to all members of the class.  The claims of the representative parties are typical of the claims of the class members.  The representative parties will fairly and adequately represent the interests of the class.

108.   Defendants' policy or practice will affect all members of the class in the same way, because Defendants' policy or practice violate and continue to violate class members' constitutional and statutory rights.   Injunctive relief enjoining Defendants from enforcing the Group Home Ordinance and the Rental Housing Ordinance against Plaintiffs and those similarly situated would remedy these problems class-wide, and is therefore appropriate to the class as a whole.

109.   The common questions of law and fact to be determined are whether the Group Home Ordinance and the Rental Housing Ordinance are unconstitutional on their face and as applied to Plaintiffs. These questions of law and fact are common to all members of the class and predominate over any question affecting individual class members.

110.   No notice is required for a class certified under FED. R. CIV. P. 23(b)(2) unless the Court directs that such notice be given.

111.   The claims of the class representatives are typical of the claims of the class members.  Like the proposed class members, the named Plaintiffs are harmed by Defendants enactment and implementation of the Group Home Ordinance and the Rental Housing Ordinance.

112.   The class representatives know of no conflict of interest among class members.   Plaintiffs are represented by pro bono counsel from the ACLU FOUNDATION OF SOUTHERN CALIFORNIA.  The ACLU and their attorneys

have extensive civil rights litigation experience and broad experience litigating class actions.

## FIRST CLAIM FOR RELIEF

### Group Home Ordinance

### Violation of the Fourteenth Amendment (42 U.S.C. § 1983)

### and California Constitution, art. I, § 7 (Equal Protection)

113.   Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully alleged herein.

114.   The Group Home Ordinance (HESPERIA, CAL., CODE § 16.16.072 (2007)) is invalid on its face and as applied to Plaintiffs and those similarly situated, because it illegally discriminates against people on probation.

115.   The Group Home Ordinance unconstitutionally distinguishes between people who are related by blood or marriage, and those who are not.

116.   The law prohibits residential structures that house more than one person on probation not related by blood or marriage, but it does not preclude two or more people who are not on probation from sharing a household, even if they are unrelated by blood or marriage.

117.   The Group Home Ordinance impinges the fundamental rights of people on probation and it is not narrowly tailored to serve a compelling government interest.

118.   The Group Home Ordinance was enacted for the illegitimate purpose of expressing hostility and animus against a politically unpopular group: probationers.  The intent and effect of the Group Home Ordinance is to cause harm to people on probation.

119.   The Group Home Ordinance bears no rational relationship to any legitimate City interest.  The Group Home Ordinance is not rationally related to any City interest it purportedly serves.

## SECOND CLAIM FOR RELIEF

### Group Home Ordinance

**Violation of the Fourteenth Amendment (42 U.S.C. § 1983)**

**and California Constitution, art. I, § 7 and 24**

**(Right to Travel, to Move Freely, and to be Free from Banishment)**

120.   Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully alleged herein.

121.   The Group Home Ordinance (HESPERIA, CAL., CODE § 16.16.072 (2007)) is invalid on its face and as applied to Plaintiffs and those similarly situated, because it bars people on probation from moving into VVFRC's transitional homes specifically, and prevents them from traveling to and establishing residence in Hesperia in general – insofar as there is little to no residential housing in the City accessible to them.

122.   Defendants' prohibition against probationer homes is an unconstitutional effort to "banish" people on probation – particularly individuals on probation who are homeless or at risk of becoming homeless – from the city of Hesperia, especially its residential neighborhoods.

123.   The Group Home Ordinance, and Defendants' application of its restrictions, is not narrowly tailored to serve a compelling government interest. Neither does it substantially relate to a sufficiently important government interest.

124.   The Group Home Ordinance bears no rational relationship to any legitimate City interest. The Group Home Ordinance is not rationally related to any City interest it purportedly serves.

## THIRD CLAIM FOR RELIEF

### Group Home Ordinance

**Violation of the First and Fourteenth Amendment (42 U.S.C. § 1983)**

**and California Constitution, art. I, § 1**

**(Right to Privacy and Free Association)**

125.   Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully alleged herein.

126.   The Group Home Ordinance (HESPERIA, CAL., CODE § 16.16.072 (2007)) is invalid on its face and as applied because it violates the privacy and association rights of people on probation by prohibiting their co-habitation, by limiting their rights to choose their household companions, and by denying them the ability to live in the type of intimate, mutually supportive, and spiritually engaged environment provided by VVFRC's transitional homes.   These rights are fundamental.

127.   The Group Home Ordinance, on its face and as applied to Plaintiffs and those similarly situated, unconstitutionally distinguishes between residents of shared households who are related by blood or marriage, and those who are not.  The law requires a conditional use permit for residential structures that house more than one person not related by blood or marriage.  It does not require a conditional use permit for residential structures that house multiple people related by blood or marriage. The law prohibits shared households for persons on probation unrelated by blood or marriage, but it does not prohibit shared households for persons on probation who *are* related by blood or marriage.

128.   The Group Home Ordinance, and the Defendants' application of its restrictions, is not narrowly tailored to serve a compelling government interest. Neither does it substantially relate to a sufficiently important government interest.

129.   The Group Home Ordinance bears no rational relationship to any legitimate City interest.  The Group Home Ordinance is not rationally related to any City interest it purportedly serves.

### FOURTH CLAIM FOR RELIEF

### Group Home Ordinance

**State Preemption**

**California Constitution, art. XI, § 7**

130.   Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully alleged herein.

131.   Under California Constitution, article XI, section 7, "[a] county or city may make and enforce within its limits all local, police, sanitary and other ordinances and regulations not in conflict with general laws."  If local legislation conflicts with state law, it is preempted and is void.

132.   The Group Home Ordinance (HESPERIA, CAL., CODE § 16.16.072 (2007)) conflicts with state law because it duplicates, contradicts, or enters an area fully occupied by general law, either express or by legislative implication. Therefore, it is preempted and void.

133.   The panoply of state laws governing the sentencing, supervision, and rehabilitation of persons on probation impliedly preempt the Group Home Ordinance by fully occupying the field of regulations concerning those persons' daily lives. The Group Home Ordinance conflicts with state law by imposing a blanket housing restriction on all persons on probation, whereas state law calls for an individualized, case-by-case determination.

134.   The Group Home Ordinance and Defendants' actions are expressly preempted by state housing law, because it contradicts and therefore conflicts with provisions of Senate Bill 2 and California Government Code section 65583 related to transitional housing, which provide that "[t]ransitional housing and supportive housing shall be considered a residential use of property, and shall be subject only to those restrictions that appl y to other residential dwellings of the same type in the same zone."

## FIFTH CLAIM FOR RELIEF
### Rental Housing Ordinance
**Violation of the Fourteenth Amendment (42 U.S.C. § 1983)**
**and California Constitution, art. I, § 7 (Equal Protection)**

135.   Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully alleged herein.

136.   The Rental Housing Ordinance (HESPERIA, CAL., CODE § 8.20.050 (2015)) violates equal protection, on its face and as applied, because it discriminates against residential renters and their families.  The law requires renters to:  (a) provide their personal identifying information, including government-issued photo identification, to their landlords and to Defendants; (b) register in Defendants' Crime Free database, which maintains files on residential tenants that associate their personal information and present and past home addresses with information culled from police call logs; (c) sign lease addendums containing terms mandated by the Rental Housing Ordinance; and (d) vacate their residence if Defendants provide a notice of criminal activity to their landlords.  The Ordinance does not impose such requirements on individuals who own their homes or on commercial/business renters.

137.   The Rental Housing Ordinance impinges the fundamental rights of residential renters and landlords, and is not narrowly tailored to serve a compelling government interest.

138.   The Rental Housing Ordinance was enacted for the illegitimate purpose of expressing hostility and animus towards a politically unpopular group.  The intent and effect of the Group Home Ordinance is to harm and thereby drive out groups of people deemed undesirable by City officials.

139.   The Group Home Ordinance bears no rational relationship to any legitimate City interest.  The Group Home Ordinance is not rationally related to any City interest it purportedly serves.

## SIXTH CLAIM FOR RELIEF

**Violates the Fourteenth Amendment (42 U.S.C. § 1983)**

**and California Constitution § 7 (Procedural Due Process)**

140.  Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully alleged herein.

141.  The Rental Housing Ordinance (HESPERIA, CAL., CODE § 8.20.050(2015)), on its face and as applied to Plaintiffs, violates Plaintiffs' rights to procedural due process.

142.  The Rental Housing Ordinance threatens to deprive Plaintiffs of their interest in their leasehold by subjecting their landlords to potential fines or revocation of their rental license and by requiring and incentivizing their landlords to initiate eviction proceedings against them without adequate procedural protections.

143.  The Ordinance is procedurally deficient because it requires Plaintiffs' landlords to initiate eviction proceedings:  (a) prior to any hearing regarding the cause for eviction; (b) upon receipt of a general "notice" of criminal activity from the Chief of Police (c) containing limited information about the alleged criminal activity; (d) even if the tenant or resident was never convicted, charged, or even arrested for any crime; (e) within 10 days, which is insufficient time for the landlord to conduct his or her own investigation into the facts alleged in the notice.

144.  The private interests at stake are considerably high.

145.  The risk of error in Defendants' process is intolerably high and additional or substitute procedural safeguards are needed.

146.  Defendants have no legitimate interest in failing to provide additional pre-deprivation process.

147.  Post-deprivation remedies do not exist or cannot cure the lack of process, and, in any event, are inadequate.

## SEVENTH CLAIM FOR RELIEF

### Rental Housing Ordinance

### Violation of Fourth and Fourteenth Amendments (42 U.S.C. § 1983)

### and California Constitution, art. I, § 13

**(Unlawful Search and Seizure)**

148.   Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully alleged herein.

149.   The Rental Housing Ordinance (HESPERIA, CAL., CODE § 8.20.050(2015)) violates Plaintiffs' rights to be free from unreasonable searches because it authorizes Defendants to conduct a warrantless, suspicionless search of Plaintiffs' papers and business records, prior to any opportunity for precompliance review by a neutral decisionmaker.

150.   The Rental Housing Ordinance also effects an unreasonable seizure because it unreasonably interferes with the possessory interest that Plaintiffs hold in their leaseholds.

## EIGHTH CLAIM FOR RELIEF

### Rental Housing Ordinance

### Violation of California Constitution, art. I, § 1 (Right to Privacy)

151.   Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as though fully alleged herein.

152.   Article I, section 1 of the California Constitution contains an express privacy protection, added as a constitutional amendment by voter initiative, to deter unnecessary collection of personal information by the government.

153.   The Rental Housing Ordinance's (HESPERIA, CAL., CODE § 8.20.050 (2015)) tenant screening and "Crime Free Database" provisions violate the right to information privacy under Article I, section 1 of the California Constitution.

## ACTUAL CONTROVERSY

154.   There exists an actual controversy between Plaintiffs and Defendants as to each and every Claim for Relief alleged herein.  Plaintiffs have suffered and will continue to suffer ongoing and continuous injuries so long as the City continues its policy and practice of enforcing its Group Home Ordinance and its Rental Housing Ordinance.

## <u>REQUEST FOR RELIEF</u>

Plaintiffs request relief as follows:

1. Assume jurisdiction of this matter;

2. Preliminarily and permanently enjoin Defendants and their directors, officers, agents, and employees from enforcing the Group Home Ordinance and the Rental Housing Ordinance against Plaintiffs and those similarly situated;

3. Certify a class under Rule 23 of the Federal Rules of Civil Procedure (or analogous procedures) as described above, pursuant to a motion for class certification;

4. Appoint Plaintiffs as Class Representatives;

5. Appoint Plaintiffs' counsel as Class Counsel;

6. Declare that Defendants' actions, policies and practices as described above constitute violations of federal and state statutory and constitutional law;

7. Declare that the Group Home Ordinance and the Rental Housing Ordinance are facially unconstitutional.

8. Award Plaintiffs their fees, expenses, costs, and other disbursements associated with the filing and litigation of this action, including reasonable attorneys' fees pursuant to any applicable provision of law; and

9. Award damages as proved at trial;

10. For such other relief as this Court deems just and proper.

Respectfully submitted,

ACLU FOUNDATION OF SOUTHERN CALIFORNIA

DATED:  May 4, 2016  By:  _/s/ *Adrienna Wong*_____
        ADRIENNA WONG

Counsel for Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28